SAMUEL WHITWELL, BENJAMIN SEAVER, GEORGE W. BOND, WILLIAM STURGIS, STEPHEN C. HIGGINSON AND SAMUEL J. BEALS *v.* WILLIAM WARNER, ABRAHAM ADAMS, ADDISON STREETER, JONATHAN ATHERTON, NATHANIEL FULLERTON, SYLVESTER STOWELL, SILAS H. HODGES, SILAS W. HODGES, STEPHEN CUMMINGS, EDWARD MANNING, and ANNA HODGES, Executrix of HENRY HODGES.

## IN CHANCERY.

Where several persons formed a partnership, for the purpose of manufacturing woolen goods, with the understanding, that they were to obtain an act of incorporation as soon as practicable, and they proceeded to manufacture cloth, and consigned it to the orators, a firm doing business in Boston, for sale, and became largely indebted to the orators, and then the act of incorporation was obtained, and most, but not all, of the members of the partnership became stockholders in the corporation, and the corporation took all the property and assumed all the debts of the partnership, and continued the business with the orators, as it had been previously transacted, and the orators transferred to the

54

Whitwell et al. *v.* Warner et al.

account of the corporation the balance due to them from the partnership, and the corporation, from time to time, made large payments to the orators, exceeding the amount of that balance, and all persons concerned in the partnership continued to act in the faith of the merger of all their property and liabilities in the corporation, and of the final settlement of all the partnership concerns, and this was known to the orators, or might have been ascertained by reasonable inquiry, and business was thus conducted by the orators and the corporation for nearly two years, and then, upon the failure of the corporation, the orators commenced a suit against them, and took judgment therein for the entire amount due to them, and there was no pretence of fraud in effecting the transfer of this balance to the account of the corporation, it was held, that the orators could not revive their claim against the partnership, nor be allowed to recover from the members of it the balance due at the time of the transfer.

The stockholders of a corporation, who avail themselves of their superior advantages for the purpose of obtaining security, from the property of the corporation, for debts due to themselves, whether it be done by attachment, or by assigning the property to a trustee, by vote, are not thereby guilty of a fraud, in contemplation of law, so as to render themselves liable personally for the debts of the corporation.

Where a manufacturing corporation have a board of directors, under whose general supervision and control the business is transacted, and an agent, who attends to the daily routine of business and its management under all ordinary circumstances, the agent has no authority, by virtue merely of his agency, to conclude a contract creating a general lien upon the personal property of the company, to secure money borrowed ; but such contract must receive the approval of the board of directors.

But if funds are furnished to the agent, to be used, upon certain specified conditions, in the business of the corporation, and the corporation claim to retain the funds, and appropriate the avails to their own use, after becoming aware of the facts, they thereby ratify the act of the agent *in solido ;* they cannot subdivide it.

But if the corporation do not thus ratify the act of the agent in obtaining the funds, and repudiate the contract whenever it comes to their knowledge, and yet the agent have used the funds in the business of the corporation, then such application of the funds by the agent to the business of the corporation was an unauthorized act, and, as such, a misapplication of the funds of the orators, who advanced them ; and, under such circumstances, as in case of misapplication of funds by a special agent, the orators may reclaim the funds, or the avails of them, into whatever hands or form they may have come.

APPEAL from the court of chancery. The substance of the allegations in the bill is as follows. On the first day of March, 1835,

the orators, Whitwell, Seaver and Bond, together with one George Bond, since deceased, were doing business in Boston under the firm of Whitwell, Bond & Co.; and at the same time the orators Higginson and Beals and the members of the firm of Whitwell, Bond & Co. were also doing business in Boston under the firm of Higginson, Beals & Co.,—but as a distinct concern from that of Whitwell, Bond & Co.; and at the same time the defendants Streeter, Adams, Stowell, Cummings, Warner, Manning, Silas H. Hodges, Atherton, Fullerton and Silas W. Hodges, together with Henry Hodges and Ezra Woodworth, since deceased, were copartners, doing business in Ludlow, Vermont, under the firm of "The Green Mountain Manufacturing Co." About the first of April, 1835, an arrangement was entered into between the firm at Ludlow and Higginson, Beals & Co., by which the latter were to furnish to the former, from time to time, loans and advances, by way of acceptances of their drafts, for the prosecution of their business of manufacturing, and, as security for so doing, the former were to mortgage to Higginson, Beals & Co. certain real estate in Ludlow, and deposite with them, from time to time, large quantities of woolen cassimeres and cloth; and in pursuance of this arrangement, the firm at Ludlow, on the eighth day of May, 1835, by Stephen Cummings, their agent and attorney for that purpose, duly authorized, did mortgage to Higginson, Beals & Co. all their real estate in Ludlow, together with all their machinery, as security for such loans and advances. Between June 10, 1835, and January 23, 1836, the firm at Ludlow, by their agent, Cummings, made drafts on Higginson, Beals & Co. to the amount of $33,000, which were duly accepted and paid by the latter firm, as they came to maturity; and between May 1, 1835, and December 1, 1835, the firm at Ludlow made sundry payments, by consignments of cloth and wool, and in other ways, so that there was then due to Higginson, Beals & Co. a balance of $19,881,80. On the thirty first of December, 1835, the firm of Higginson, Beals & Co. was dissolved, and all its property and business were transferred to Whitwell, Bond & Co., and the balance due from the firm at Ludlow was, with the assent of that firm, charged to them upon the books of Whitwell, Bond & Co. In November, 1835, the defendants Warner, Adams, Atherton, Cummings, Streeter, Stowell, Manning, Fullerton, Silas H. Hodges and

Silas W. Hodges, together with Silas Briggs and David S. Roberts, now resident out of the State, and Henry Hodges and Ezra Woodworth, since deceased, were incorporated, by the legislature of Vermont, by the name of the Green Mountain Woolen Manufacturing Co. ; and the corporation was organized about the 18th of January, 1836. This corporation assumed the debts and property of the former copartnership, and divided their stock among the corporators, April 6, 1836, in shares of $500 each; and, on the fourteenth day of June, 1836, in order to obtain farther loans of money for the prosecution of their business, and to make security for the same, as also for the debt due to Higginson, Beals & Co., they entered into a written agreement with Whitwell, Bond & Co., purporting to bear date January 1, 1836, by which it was agreed, among other things, that the corporation should keep their mills in good order and employ suitable hands for the manufacture of woolen goods, that when wool should be purchased with the avails of drafts drawn on Whitwell, Bond & Co., it should remain the property of that firm in all its stages, until delivered to them and sold, for the purpose of securing them for their advances and commissions, and for the debt due to Higginson, Beals & Co., that all the goods manufactured,—except those sold at the mills, not to exceed $2000 in amount,—should be consigned to Whitwell, Bond & Co., to be by them sold, under the charge of some suitable person, that for farther security the corporation should execute a mortgage of their real estate, that Whitwell, Bond & Co. were to accept the drafts of the corporation, on account of the consignments, to an amount not to exceed three fourths their value, that the contract should continue for five years, but that, on due notice, and on being paid for all advances, Whitwell, Bond & Co. should convey to the corporation their interest in all the wool then on hand. For the purpose of effecting these securities, the president of the corporation, on the 25th of April, 1836, in pursuance of a vote of the corporation, executed a mortgage of the real estate to Whitwell, Bond & Co., conditioned to secure them for whatever balance might be due on any loans contracted within five years ; and Whitwell, Bond & Co., relying on the good faith of the corporation, not only omitted to press the payment of the debt due to Higginson, Beals & Co., but furnished the corporation with funds sufficient to purchase 65,691 pounds of wool, at a cost of $41,058,43,

which, on the 3d of September, 1836, remained on hand with the corporation, for the security and benefit of Whitwell, Bond & Co.; and on that day the corporation, by their agent, Cummings, informed Whitwell, Bond & Co., that the said wool had been purchased for their benefit, under the contract above mentioned; and Whitwell, Bond & Co. were willing, that the wool should remain in their hands, to be manufactured into cloth, and in that form consigned to them according to the contract. From September 3, 1836, to April 19, 1837, large quantities of wool and cloth, purchased with the funds of Whitwell, Bond & Co., and in the various stages of manufacture, remained in and about the mills of the corporation, and should have been applied to the payment of the advances made by Whitwell, Bond & Co. and the debt due to Higginson, Beals & Co.; but on the 19th of April, 1837, the stockholders in the corporation intending to defraud the orators, conveyed to the defandant Warner, for his benefit and that of the other stockholders, all the said wool and cloth, and Warner disposed of the same. Whitwell, Bond & Co., for the purpose of securing the debt due to them, exclusive of the debt to Higginson, Beals & Co., sued out their writ and attached certain personal property of the corporation, and recovered judgment thereon for $35,000, damages; and the property attached was sold for $4608,82,—which is all that has been received upon that judgment; and the mortgage executed by the corporation was also foreclosed, although the mortgaged premises have proved to be of but little value. Warner commenced an action of trespass against the officer, who made the attachment upon the writ of Whitwell, Bond & Co., and that suit is still pending. And by reason of the premises Whitwell, Bond & Co. have become insolvent, and have assigned their property to the orator William Sturgis, including the debt due to Higginson, Beals & Co., in trust for their creditors.

The orators prayed, that an account might be taken of the wool, cloth and materials on hand in the factory when Warner took possession thereof, and also of the amount due to Higginson, Beals & Co. and to Whitwell, Bond & Co., and also of the amount received by Whitwell, Bond & Co. upon their judgment, and that the defendants might be decreed to pay to the orators the balance, or to deliver to them the said wool, cloth and materials, and that the suit

in favor of Warner against the attaching officer might be enjoined, until the orators might be heard in the premises, and for general relief.

The defendants Warner and Silas W. Hodges appeared and filed their answers; in which they admitted the existence of the firms of Higginson, Beals & Co. and Whitwell, Bond & Co., the dissolution of the former firm and the transfer of its property and business to Whitwell, Bond & Co., and the assignment by the latter firm to Sturgis, as alleged in the bill. These defendants also admitted, that about the sixteenth of April, 1835, Henry Hodges, then living, and the defendants Silas W. Hodges, Streeter, Stowell, Cummings, Silas H. Hodges, Atherton and Fullerton, together with Ezra Woodworth, since deceased, executed an agreement in writing, for the formation of a copartnership, for the manufacture of woolen goods, with an understanding that an act of incorporation should be obtained as soon as possible, and that the copartners should each furnish a specified sum towards the capital stock of the firm; and Warner alleged, that he signed this agreement with the firm name of " Adams & Warner," which had formerly been the style of partnership of himself and the defendant Abraham Adams, and that he then believed himself authorized so to sign, from a conversation that he had held with Adams; but these defendants denied, that Manning was ever a party to this agreement. These defendants also admitted, that the firm at Ludlow, thus formed, entered into an arrangement with Higginson, Beals & Co. for advances, and drew drafts upon them, and that a mortgage was executed to them as security, and that December 31, 1835, there was a balance due to them, as alleged in the bill. They also admitted the organization of the corporation, and the apportionment of its stock, as alleged, but insisted, that the copartners in the firm at Ludlow ceased to act under their articles of agreement, January 4, 1836, and that they are not liable for any subsequent transaction; and they alleged, that Whitwell, Bond & Co. never in fact transacted any business with the co-partnership, and that among the first items charged by them to the corporation was the balance due to Higginson, Beals & Co., and that the corporation were called upon to pay that balance, and did in fact pay to Whitwell, Bond & Co., previous to September 7, 1836, more than $21,340, and previous to July 1, 1837, more than

$45,000, of which more than $26,000 were the avails of cloth and wool consigned, and that these sums were credited by Whitwell, Bond & Co. in their account against the corporation; and the defendants insisted, that these sums should have been and were applied in payment of the debt to Higginson, Beals & Co., and that so all the defendants were discharged from liability on account of that debt. These defendants also admitted, that Whitwell, Bond & Co. paid drafts drawn upon them by the corporation, from time to time, and made purchases for them, and paid for purchases made by the corporation; and that there was, according to the account, due to Whitwell, Bond & Co., April 19, 1837, $47,422,91, including the debt due to Higginson, Beals & Co.; and that, April 25, 1836, the corporation mortgaged their real estate to Whitwell, Bond & Co., as alleged in the bill.

These defendants denied, that the corporation ever executed any agreement of the nature of that set forth in the bill, and alleged to have been executed June 14, 1836; but they admitted, that the defendant Cummings was then, and until April 19, 1837, the agent of the corporation, with power to transact its ordinary business, and that he, pretending to act as such agent, did at some time execute such a contract; but they denied that he had authority to do so, or that the contract was ever ratified by the corporation, and alleged that it was artfully concealed by Cummings from the knowledge of these defendants and the other principal members of the corporation, until the execution of the assignment to Warner, April 19, 1837. These defendants admitted the purchase of wool by the corporation, subsequent to June 14, 1836, as alleged, but denied that it was purchased under said contract, or in the name of Whitwell, Bond & Co., or on their credit, or for their benefit, or that it was paid for by drafts drawn on them,—except two lots, amounting to about three thousand pounds,—but averred, that it was purchased in the name and for the benefit of the corporation, that the corporation still owed for a large quantity of it, that a large quantity of wool had been purchased upon security being given by individual members of the corporation, that no drafts had ever been drawn upon the avails of that wool, in the particular manner in which it was specified in the contract it should be done, and that no distinction was ever made between funds raised by drafts on Whitwell, Bond& Co., and those

obtained by other means; and they denied, that Whitwell, Bond & Co. were ever informed by the corporation, that any of said wool was purchased in their name, or for their benefit, and alleged, that, if Cummings ever communicated such information, he did it secretly and without authority; and they also alleged, that the cloth manufactured from the wool mentioned in the bill was in fact consigned to Whitwell, Bond & Co., or otherwise disposed of, previous to April 19, 1837.

These defendants also admitted, that on the 19th of April, 1837, the corporation were in possession of the proceeds of about 26,200 pounds of wool,—but from what lots they could not tell; and they averred that the corporation were then heavily indebted to their workmen, and to Hodges and Warner, to an amount exceeding $20,000, for advances made for the purchase of wool, and that the corporation on that day duly executed an assignment of their property to the defendant Warner, in trust for the benefit of their creditors, —neither the defendant, Warner, Henry Hodges, Silas W. Hodges, nor Silas H. Hodges, having then any knowledge, that Whitwell, Bond & Co. had any lien upon the property, other than by their mortgage; and that Warner took possession of the property, and disposed of a small portion of it; and that the balance was attached by various creditors of the corporation, who could have held the property against Whitwell, Bond & Co.,—the latter never having taken possession thereof,—and that the property was sold upon the executions obtained in these suits. These defendants also admitted, that Whitwell Bond & Co. recovered judgment against the corporation for $35,000 damages; and they averred, that this included the balance due to Higginson, Beals & Co.; they also admitted, that the mortgage was foreclosed, as alleged in the bill; and they averred, that thereby the orators demand against the corporation was satisfied. And these defendants admitted, that a suit had been commenced by Warner against the attaching officer of the orators, as alleged in the bill, and insisted, that Warner has good right to recover in that suit.

The answer of Silas H. Hodges was in substance the same with that of Warner and Silas W. Hodges;—and he expressly denied all knowledge of the contract, alleged in the bill to have been executed June 14, 1836, until April 19, 1837, and all knowledge, that Cum-

mings had ever given Whitwell, Bond & Co. to believe that they had a lien upon the wool, until May, 1842.

The defendant Abraham Adams answered, denying that he was ever a member of the copartnership, or of the corporation, or that he ever knew, until 1841, that the firm name of "Adams & Warner" was subscribed to the articles of agreement, or that his name was in any manner connected with the corporation, or that he ever gave authority to any person so to make use of it; and he averred, that the firm of Adams & Warner was in fact dissolved in 1833.

The defendant Atherton answered, that he became a member of the "Green Mountain Manufacturing Co.," the copartnership, and that he paid $500, towards the capital stock; but denied, that he ever attended any meetings of the firm, or of the corporation, or participated in their business, or in the conveyance made by the corporation to Warner.

The defendant Fullerton answered, that he executed the agreement set forth in the answer of Warner, upon the formation of the copartnership,—but that there was an agreement at the time, that Cummings should save him harmless from all liability therefor,— and that Cummings did afterwards deliver to him a bond of indemnity to that effect; and he averred, that from that time he considered the stock as belonging to Cummings, and that he never made any payment, nor was called upon to make any, towards it, and never attended any meetings, nor received notice to attend any, nor in any manner participated in the business of the firm, or of the corporation.

The defendant Anna Hodges, excecutrix of Henry Hodges, answered, admitting some part of the allegations in the bill, and denying all knowledge as to the residue. Subsequently she filed a supplemental answer, averring that the estate of Henry Hodges had been represented insolvent, and commissioners of insolvency had been appointed, who made their return, February 7, 1842, which was accepted by the probate court, and that the orators presented no claim against the estate for allowance.

The defendant Addison Streeter filed his plea in bankruptcy. As to the other defendants the bill was taken as confessed.

The answers were traversed; and testimony was taken upon both sides. The orators filed, as evidence, the contract of June 14, 1836,

55

bearing date January 1, 1836, which was under seal, and signed by George Bond,—for Whitwell, Bond & Co., and by Stephen Cummings, as agent for the Green Mountain Woolen Manufacturing Company, which provided in substance,—1. That the corporation should keep their mill and machinery in good condition, and employ suitable operatives for carrying on the business of manufacturing cassimeres ;—2. That the corporation should consign all their manufactured goods, except what should be sold at the mill, not to exceed $2000 in amount, to Whitwell, Bond & Co., to be by them sold for a specified commission;—3. That the corporation might draw on Whitwell, Bond & Co., on account of such consignments, for the average amount of three-fourths their value,—keeping them in funds by avails of sales, or by drawing new drafts to meet those becoming due, when the avails of sales were not adequate;— 4. That if the corporation should want an extra supply of wool, Whitwell, Bond Co. would purchase it, the stock on hand, so purchased, not to exceed in value, at any time, $20,000,—the purchases, if in Boston, to be made on a credit of six months, and if in the interior, by drafts on Whitwell, Bond & Co.,—in either case funds to be provided, as stated in the third section,—and that the said wool should remain, in all its various stages, until it should be delivered to Whitwell, Bond & Co., and sold, the property of Whitwell, Bond & Co.;—and that, when sold, they should charge to the account of the goods the cost of the wool, and the payment made to the corporation thereon, as afterwards provided, and credit to said account the sales of the goods, and transfer the balance to the debit or credit side of the account of the corporation, as the case might be ;—5. That on all goods made of wool so purchased, the corporation, on delivery thereof, might value on the second party to the amount of thirty cents per yard, and no more, until the account should be made up ;—6. That as farther security, the corporation should mortgage their real estate and machinery, to respond, in its full value, to any claims which Whitwell, Bond & Co. might have against them, contracted within five years,—and also, that the corporation should keep their building, machinery and stock insured, for the benefit of Whitwell, Bond & Co.;—7. That Whitwell, Bond Co. should render an account of sales and account current twice each year ;—8. That this agreement should continue in force for five

years, unless either party should sooner determine it by notice to that effect in writing; and that when the contract should be thus determined, or should expire by its own limitation, the account should be made up, and goods should be consigned to cover the balance; and if goods were not so consigned within three months, then Whitwell, Bond & Co. might demand the balance in money; and that, if the corporation ceased at any time to manufacture goods, or to consign the goods manufactured, then Whitwell, Bond & Co. might demand the balance at the end of thirty days; and that, whenever the corporation should pay to Whitwell, Bond & Co. so much of their advances for wool, as had not been refunded, with two and a half *per cent.* commission on the amount, the corporation should be discharged from the stipulations of the contract, and Whitwell, Bond & Co. should convey to them their interest in the wool;—9. That the property consigned and pledged, as above mentioned, should be held by Whitwell, Bond & Co. as security for the debt due from the corporation to Higginson, Beals & Co. On the back of this contract was a written guaranty of its fulfilment, signed by the defendants Cummings, Streeter, Stowell and Manning, and by David S. Roberts, who was also then a stockholder in the corporation. The orators also give in evidence a letter addressed to Whitwell, Bond & Co., by Cummings, as agent, dated September 3, 1836, together with an invoice of 65,691 pounds of wool amounting to $41,058,43, entitled "Invoice of wool purchased for Messrs. Whitwell, Bond & Co.," and with a note appended, stating that the wool was safely stored, and subject to their order. The orators also gave in evidence the mortgage deeds described in their bill, the assignment to William Warner, the correspondence between Stephen Cummings, as agent, and the orators, and the drafts drawn upon Higginson, Beals & Co., and Whitwell, Bond & Co., in favor of the corporation.

The defendants gave in evidence the record of the foreclosure of the mortgage to Whitwell, Bond & Co.,—which mortgage was conditioned for the repayment to Whitwell, Bond & Co. of whatever balance might be due to them on loans contracted within five years from its date,—from which it appeared, that the orators therein alleged in their bill of foreclosure, that they " had paid off and caused to be discharged" the mortgage to Higginson, Beals & Co. Other

testimony was filed upon both sides,—the substance of which sufficiently appears in the opinion of the court.

The court of chancery, September Adjourned Term, 1845,— HEBARD, Chancellor,—dismissed the orators' bill ; from which decree the orators appealed.

*C. French* and *L. B. Peck* for orators.

1. It is contended, that for the recovery of the sum of $19,881,80, and the interest since December 31, 1835, the defendants, except Edward Manning, are liable as copartners.

2. It is admitted, that Cummings was the general agent of the corporation, for conducting its business operations and financial affairs. This agency was not created by any vote or writing of the corporation, and none was necessary. An appointment by parol was sufficient. Ang. & Ames on Corp. 132, 155–157. *Perkins* v. *Washington Ins. Co.*, 4 Cow. 645. As such agent he had authority to bind the corporation by the contract of January 1, 1836. This position does not, it is conceived, conflict at all with those cases, which hold, that it is not incident to the power of a general agent to mortgage the real estate and machinery of a corporation. These cases proceed upon the ground, that this is a matter not falling within the scope of his authority, that it is not carrying on the business of the company. As he has no power to sell the real estate and machinery, he has no power to mortgage or pledge it. But a general agent has authority to sell the manufactured goods; and if he can sell, why may he not pledge them, to raise funds for the use of the company? In the analogous case of factors, their power to pledge the goods entrusted to them, for the debts of their principal, is unquestionable. Story on Agency 100. Cummings, in addition to his general powers as agent, was authorized to borrow money for the use of the company. This is admitted by the answers of Silas W. Hodges, Warner and S. H. Hodges. If, then, he was empowered to bind the corporation by contracts for loans, his authority to execute the necessary securities would seem to follow, as a necessary incident to this power. *Despatch Line of Packets* v. *Bellamy Manf. Co.*, 12 N. H. 228. *Fenn* v. *Harrison*, 4 T. R. 177. *Helyear* v. *Hawke*, 5 Esp. R. 75. Paley on Agency 170–1. *Odiorne* v. *Maxcy*, 13 Mass. 178, 182. *White* v. *Westport Manf. Co.*, 1 Pick. 215. DAG-

GETT, J., in *Stow* v. *Wyse,* 7 Conn. 214. Long on Sales, Rand's Ed., 390. Story on Agency 87.

3. Under the circumstances of the case, the corporation should be bound by the act of their agent, although he may have exceeded his authority. He was permitted to act, in all the dealings with the orators, as though he was authorized to make the contract, without the corporation making any inquiries of the orators as to the terms, or conditions, upon which they were making their large advances, or an intimation being given to them, that the stipulations of the agreement, upon which they were made, would not be performed. It is now too late, after the corporation have received the benefit of these advances, for them to insist, in a court of equity, that they are not bound by the agreement, under and upon the faith of which they were made.

4. But if Cummings had no authority to execute the contract in the name of the corporation, they may be bound by a subsequent ratification, and the seal may be rejected. In that case the agreement would stand as the parol contract of the corporation, made by its agent, and binding on them, provided they afterwards ratified it. *Despatch Line of Packets* v. *Bellamy Manf. Co.,* 12 N. H. 236. *Warner* v. *Ocean Ins. Co.,* 4 Shep. 439. *Troy Turnpike Co.* v. *McChesney,* 21 Wend. 296. *Bulkley* v. *Derby Fishing Co.,* 2 Conn. 252. *Proprietors of Canal Bridge* v. *Gordon,* 1 Pick. 297. *Fleckner* v. *U. S. Bank,* 8 Wheat. 363. *Bank of U. S.* v. *Dandridge,* 2 Wheat. 64, 70–74. *Thayer* v. *City of Boston,* 19 Pick. 511. 14 Johns. 118. Ang. & Ames on Corp. 122–174. Story's Agency 49–51, 53–55, 247–248.

5. There is sufficient evidence of a ratification of the contract to bind the corporation. The mortgage mentioned in the contract has been executed, in pursuance of a vote of the company. The corporate seal, or what purports to be the corporate seal, was affixed to the contract; the stockholders, who owned a majority of the stock, guaranteed its performance in writing. Drafts to a large amount were drawn from time to time on the orators, by the agent, and paid by them, the avails of which went to the use of the corporation. Accounts current were forwarded to the company by the orators, according to the stipulations of the contract. It was under this agreement, that the orators, relying upon the lien therein

provided for, accepted and paid the drafts. In fact, the existence of this lien is impliedly recognized by the directors in their letter to the orators under date of April 20, 1837. Under these circumstances the company, having received the benefit of the advances, must be bound by the contract. PARKER, Ch. J., in *Despatch Line of Packets* v. *Bellamy Manf. Co.*, 12 N. H. 236. *Newhall* v. *Dunlap*, 2 Shep. 180. See, also, *Hamblett* v. *Hamblett*, 6 N. H. 337. *Shiras* v. *Morris*, 8 Cow. 60. Story's Agency 245, 253. 1 U. S. Dig. 245, *pl.* 278. *Newell* v. *Hurlburt*, 2 Vt. 351.

6. If the seal be rejected, it then is to be regarded as a parol contract, and created a lien on the property. A pledge or mortgage of personal property may be created by an agreement, which is not under seal. This very question was in judgment in the case in 12 N. H. 236. The contract is in the nature of a hypothecation, and, as such, is obligatory on the parties, and valid as between them, though no possession of the property was taken by the orators. *Calkins et al.* v. *Lockwood*, 16 Conn. 276. *Macomber* v. *Parker*, 13 Pick. 175. Story on Bail 293–298, sec. 290–294. In equity it will be held as an equitable mortgage, or assignment, of the property, for the security of the debt, and will be enforced. *Hendrics* v. *Robinson*, 2 Johns. Ch. R. 283. *Clark* v. *Mauran*, 3 Paige 373. *Bradley* v. *Root*, 5 Ib. 632. *Freeghling* v. *Scherader*, 2 Scott 135. *Read* v. *Gaillard*, 2 Dessau. 552. 1 Amer. Ch. Dig. 169, pl. 8. *Legard* v. *Hodges*, 1 Ves. 477. 2 Story's Eq. 481. sec. 1231. Prec. in Chanc. 174, 175. Story's Eq. 307, 308.

7. By the terms of the contract, the wool purchased with the orators' funds was to remain their property. That portion of the wool so purchased, and the cloth manufactured from it, was not the property of the company; the title never vested in them; and the orators have the right to follow it into the hands of the defendants, even if they took it without notice of the orators' lien,—as they do not stand in the light of purchasers, but in that of creditors.

8. But the defendants had notice of the orators' lien. This is evident from the answers and evidence in the case. They were not therefore *bona fide* holders of the property, and must account to the orators for it. *Bishop et al.* v. *Holcomb*, 10 Conn. 444. Warner, the trustee, had notice of the lien; and is not notice to him, notice to the *cestui que trust* ? 1 Story's Eq. 383, and cases there cited.

9. The wool and cloth constituted a trust fund in the hands of the corporation, by the terms of the contract, for the payment of the orators' debt. And this fund having been dissipated by the vote of the 19th of April, 1837, and placed beyond their reach, the stockholders, who were present and assented to the vote, must be held personally responsible. The act was a fraud on the rights of the orators, whether the property is regarded as a trust fund, or as subject to the lien created by the contract. Those stockholders who were present at the meeting of the 19th of April must, in the absence of all proof, be presumed to have given their assent to the vote. If they would protect themselves from the effect of that vote, they should have given some evidence of their dissent. *Wood et al.* v. *Dummer et al.*, 3 Mason 308. *Ward* v. *Griswoldville Manf. Co.*, 16 Conn. 593. *Slee* v. *Bloom*, 19 Johns. 484. *Briggs* v. *Penniman*, 8 Cow. 387. *Nathan* v. *Whitlock*, 9 Paige 152. 2 Story's Eq. 498–9, sec. 1252. See, also, *Bigelow, Adm'r*, v. *Cong. Society of Middletown*, 11 Vt. 283. *Mumford* v. *Murray*, 6 Johns. Ch. R. 452. 2 Am. Chanc. Dig. 576, *pl.* 6.

*S. H. Hodges* and *S. S. Phelps* for defendants Warner, S. W. Hodges and S. H. Hodges.

First; A fatal variance exists between the indenture produced by the plaintiffs and the contract relied on in the bill. They allege an agreement by the corporation, that all the wool purchased with funds obtained on their acceptances should stand pledged to them, to secure their general balance. The indenture merely provides, that, if the corporation wish to secure an extra supply of wool, the plaintiffs are to purchase it; and the wool so purchased (and no other) is to remain their property, until manufactured and sold. Accordingly they charge, that the defendants purchased certain parcels of wool with funds obtained on their acceptances; not that they ever purchased an extra supply, or advanced a dollar for that purpose. *Thomas* v. *Warner*, 15 Vt. 110. *Legh* v. *Haverfield*, 5 Ves. 452. *Woollam* v. *Hearn*, 7 Ib. 211. *Lindsay* v. *Linch*, 2 Sch. & Lef. 1. *Harrison* v. *Nixon*, 9 Pet. R. 483. *Boone* v. *Chiles*, 10 Ib. 177. *Skinner* v. *Bailey*, 7 Conn. 496. 1 Pet. R. 380. 2 Johns. Ch. R. 355. 5 Day 67, 223. 5 Conn. 592. 7 Ib. 342.

Second; The plaintiffs never acquired any lien on the property in question.

I. The indenture relied on was never in force. It is conceded, that it was never authorized by any express vote of the corporation, or directors.

1. It is claimed, however, that Cummings had authority to execute it, in his capacity of agent. This is denied in the answers, and must be made out by the plaintiffs. It cannot be inferred from the nature of his agency,—which is not known in law like that of a factor, consignee, or carrier. The agent of a factory has precisely the power his employers give him, and no more. Neither can an authority to pledge to such an extent be presumed from the right to sell, in the ordinary course of business, or to borrow on the credit of the principal. There was a board of directors, whose exclusive province it was, to make such contracts. The plaintiffs were fully aware of this, and required a vote of the directors, authorizing the contract, as essential to its validity.

As to the invoice of September 3, 1836, Cummings had no more authority to execute that, than the indenture.

2. It is also claimed, that the corporation borrowed money on the strength of the contract, and cannot now repudiate it. We admit the borrowing of money, but deny, that it had any reference to the contract. The corporation drew upon consignment of their cloth to plaintiffs, had become largely indebted to them, relied on their pecuniary aid, and, to indemnify them, agreed to pay them the market rate of interest. And the plaintiffs were glad to secure their business on these terms. All this took place long before the pretended execution of the indenture, which was carefully concealed from the directors, and no change in the plaintiffs' mode of dealing occurred, to apprise any one, that they were acting under any new arrangement; nothing to awaken a suspicion that they were relying on any fresh security. There is no ground whatever for presuming, from the fact of the corporation's borrowing money of the plaintiffs, that it was on the strength of the indenture. The bill, moreover, relies on an express and formal execution of the contract, and no where charges an implied assent to it. It gives no opportunity to answer such a charge, or explain the acts or conduct, from which the assent is implied. The rights of the parties and the mode of

proof are so essentially modified by this, that the bill should be dismissed. Gresley's Eq. Ev. 160, 161, and cases cited. 2 Dan. Ch. Pr. 410, and cases cited. *Hall* v. *Maltby*, 6 Price 240. *Crocker* v. *Higgins*, 7 Conn. 342.

II. Admitting the indenture to have been in force, the plaintiffs never took the measures requisite to acquire a lien under it, nor acted upon it.

No purchases were made by them, or in their name. They should have charged their advances upon the extra supply of wool separately, and could only carry the balance of the account to that of the corporation, when the sales of cloth were completed. Instead of this, they charged these advances, if any, in one account indiscriminately with their other acceptances, treated the balance of the whole as cash due, and required payment; charged extra interest upon it; sued for the whole and embraced it in their judgment. In fact, they were never asked to make the purchases contemplated in the stipulation for a pledge, and never undertook to make them. No wool was bought under it, or became their property in consequence. It is true, an extra supply of wool was purchased, and they were asked to lend their aid in paying the notes for the purchase money, as they should fall due, months afterwards; but it was merely as a matter of favor, not of obligation, and in the expectation that the wool would be manufactured and the proceeds realized in season to meet the plaintiffs' acceptances. The plaintiffs assented, not on the ground that they had agreed to do so, but expressly reserving the right to alter their minds, and decline accepting,—a right they afterwards exercised.

Third ; To make the stockholders personally liable, the bill should have distinctly charged them with notice of the plaintiffs' lien, and with fraudulently defeating it. Each defendant has a right to answer and meet such a charge, independently of the others. For want of any such charge the bill should be dismissed. *Harman* v. *Tappenden*, 1 East 555. *Vose* v. *Grant*, 15 Mass. 505. *Spear* v. *Grant*, 16 Ib. 9. *Middletown Bank* v. *Russ et al.*, 3 Conn. 135. *Same* v. *Magill*, 5 Ib. 28. These charges should also be clearly sustained. It is not shown, however, that a single defendant voted for the assignment. On the very eve of it they had some notice, perhaps, of the plaintiffs' claim ; but they had a perfect right to re-

56

pudiate it then, except those who had misled the plaintiffs into relying upon it.

The plaintiffs seek also a decree for the balance of Higginson, Beals & Co.'s account. Our objections are these; — 1. It is not asked for in the bill; and, had it been, would have made the bill multifarious. 2. The remedy for the claim, if any, is sufficient at law. 3. This balance has been transferred to Whitwell, Bond & Co., charged by them to the corporation, (who have received the funds for paying it,) and is merged in their judgment. 4. That charge is among the first in Whitwell, Bond & Co.'s account against the corporation, and, with the previous items, has been paid by the credits in the account, which must be applied in satisfaction of the first charges, there having been no other appropriation. Theob. on Pr. and Sur., 1 Law Lib. 131, and cases cited. *Devaynes* v. *Noble*, 1 Mer. 601. *Bodenham* v. *Purchas*, 2 B. & A. 39. *Brooke* v. *Enderby*, 2 B. & B. 70. *Fairchild* v. *Holly*, 10 Conn. 175.

*S. H. Hodges* for defendant Anna Hodges.

This defendant cannot be made personally liable for her testator's misconduct; and all claims against his estate are barred by the proceedings in the probate court.

*Washburn & Marsh* for defendants Adams and Fullerton.*

*S. Fullam* for defendant Atherton.

The opinion of the court was delivered by

REDFIELD, J. There are some grounds, upon which the plaintiffs seek to charge the defendants, which the court have not considered sound, and which it is not deemed important to report at much length.

---

* The several defendants being represented by their respective counsel, a question was made, whether the court would allow arguments from each ; and it was held, that, under the circumstances of the case, the court would allow two general arguments upon the points common to all the defendants, and would then allow the defendants, who claimed to be discharged for reasons peculiar to their own connection with the business, to be heard, by their counsel, upon the particular grounds on which they relied.

1. It is claimed, that the defendants are liable for the balance, which was due from the old partnership, which was professedly merged in the corporation. If this be so, it is confessedly contrary to the expectation of all parties concerned, for many years, during which time the members of the old firm, some of whom never became members of the corporation in any other sense than by having been members of the former partnership, continued to act in the faith of the merger of all their *property* and *liabilities* in the corporation, and of the utter extinction of the partnership and the final settlement of all its concerns. This was in fact known to the plaintiffs, or might have been ascertained upon the slightest inquiry; and, in addition, there is not the most remote ground of belief, that the plaintiffs have ever acted upon the faith of any such balance against the partnership still remaining unpaid. Their whole conduct, from the first to the last, gives a positive denial to the belief in the existence of any such liability on the part of the defendants, as partners, as is now claimed. The mere fact of the plaintiffs' taking a judgment against the corporation for this very balance is, of itself, conclusive upon this point, and, in addition to all this, the *corporation*, subsequent to the transfer of this balance into the new account between themselves and the plaintiffs, have made large payments, to many times the amount of that balance; and many thousand dollars, too, of the amount which the plaintiffs have received, was realized out of a mortgage, which they had upon the property originally belonging to the partnership.

Under these circumstances, to suffer the plaintiffs to go back and subdivide the elements of that judgment, and thereby to revive the extinct liability of a partnership long closed, having performed its office, could only be endured upon the ground, that the transfer and absorption of this balance of the old partnership debt had been effected by fraud, or misapprehension on the part of the plaintiffs. Nothing of that kind is shown in regard to this part of the case. But on the contrary it seems to us, that to allow the plaintiffs thus to revive the liability of the partnership, after its members had so been lulled into security by the acts of the plaintiffs, would be a virtual fraud upon them.

2. The second general ground, upon which the liability of the defendants is argued, is some supposed fraud in those stockholders,

who participated in the general assignment to Warner, for the ben-efit, mainly, of those who made the assignment. We have no doubt of the general proposition, that the stockholders and directors of a corporation may so conduct, as to become responsible for all the debts of the corporation. They may have originally contracted debts, in the name and upon the credit of the corporation, without any purpose of payment, or without any reasonable probability, that payment could be made by the corporation ; or they may have di-verted all the funds of the corporation to their own use; in either case evidencing a settled purpose of defrauding the creditors.

But the argument, in the present case, is put mainly upon the ground, that the defendants have taken funds of the corporation in payment of their own debts, upon which they knew the plaintiffs held a *special lien* for the payment of *their* debt. This seems to us to be putting the case upon grounds more difficult to sustain, than the main ground upon which the plaintiffs rest their claim, and one far less sustained by the proof. This view of the case rests, for its corner stone, upon a proposition, which is of itself sufficient to enti-tle the plaintiffs to full relief, aside from any *premeditated fraud* on the part of the defendants. For if the plaintiffs had any subsisting lien upon the stock and goods of the corporation, they may pursue it, into whoseever hands the property comes. And it matters not how the property is passed, whether with or without knowledge of the plaintiffs' lien. It is not, then, important, in this view of the case, whether the defendants, in making that assignment, acted fraudulently, or not,—that is, whether they entertained any precon-ceived design of defeating the plaintiffs' lien, or were ignorant of it, or believed it to be invalid in law. We need not, then, expend time upon these points.

But it does not occur to us, that there is any just ground for charging the defendants, with the exception of Cummings, perhaps, with any actual or constructive fraud. As to constructive fraud, it is not competent, certainly, to predicate this of the mere fact of a stockholder's availing himself of his superior advantages, to obtain security for debts due to himself, to the exclusion of other debtors. The stockholder and the stranger, who are both creditors of a cor-poration, no doubt stand in very unequal positions. But it is an inequality which the law allows, and which is understood by those

who contract with corporations, and one which will always tend, more or less, to bring in doubt the credit of such bodies. But it is a subject, with which this court have nothing to do. Some modification of the law upon this subject has been attempted, I believe,— to what purpose time must determine. We are content to leave that subject as it is. And while we would, no doubt, guard the exercise of such a privilege, in the stockholders of a corporation, with some degree of severity, we must not forget, that all just rights are entitled to a fair consideration in a court of justice. We should not, then, watch the exercise of a right with so much strictness, as to declare its mere exercise to be a constructive fraud.

And as to any *express* fraud in the present case, there seems to us to be no proof. We have found nothing in the case, which, upon a charitable construction, should cast suspicion upon the general conduct of the stockholders, in regard to the management of the concerns of the company, or in relation to this assignment in particular, unless, perhaps, the placing too much confidence in others,—which is not a common characteristic of dishonest men. They may have trusted too implicitly to Cummings, and, so far as they did, leaned somewhat upon a broken staff. But it is by no means certain, that the stockholders in fact discovered his duplicity sooner than the plaintiffs, or, as the business was conducted, that they had more *opportunity* of *detecting* it. Both, we may fairly conclude, acted in perfect good faith.

The ordinary mode of investigation, made by stockholders into the concerns of a corporation, would have discovered nothing to excite suspicion of the fairness of the conduct of the agent, until the final developement in April, 1837. Being then pressed to the wall, he disclosed the contract in favor of the plaintiffs,—which had, indeed, been made known to certain of the stockholders, and its fulfilment guaranteed *by them*, but had purposely been kept back from the knowledge of the most responsible of the stockholders, in order to induce them to make advances and incur liabilities on behalf of the company; one, only, of this class of the stockholders had seen the rough draft of the contemplated contract in favor of the plaintiffs; but knowing, we may presume, that the authority of the agent did not extend to the executing of such contracts, he might not have supposed he would attempt it.

Thus this agent was in fact dealing double, both with the plain-
tiffs and the responsible stockholders of the company, in order to
promote his own purposes.   And, having said so much in favor of
the good faith of the defendants, we may add, that there is not the
least possible doubt of the entire good faith of the plaintiffs.   They
intended to be made as safe as the circumstances would permit.
They were themselves in doubt, whether the general agent of such
a company had authority to execute such a contract, as they re-
quired.   They judged, and correctly, we think, that it required the
ratification of the directors, and they required, that such ratification
should be had, but were told by Cummings, that it was required to
be ratified by the stockholders.   This was perhaps a mere excuse
for delay.   But finally the guaranty of a *majority* of the stockhold-
ers was sent to them.   This they might deem sufficient to bind the
company; for some doubt was entertained by this court, whether
the consent of all the stockholders was not equivalent to a vote of
the corporation ;  *Wheelock* v. *Moulton,* 15 Vt. 519;  or they might
have supposed the personal guaranty of the stockholders a sufficient
indemnity against loss, or a sufficient assurance, that this contract
would be ratified by the same stockholders.

3. " We come, then, to the only ground, upon which, it seems to
us, the plaintiff can expect to prevail in this suit,—that is, the
agency of Cummings, and by force of the contract which he had
attempted to execute.   This agency of Cummings may be viewed
in two lights,—first, his innate authority, resulting from his appoint-
ment and the *general scope of the business, which he was intrusted*
to execute ;—second, any ratification of the contract, either express
or implied, either by the company or their directors.

" 1. In regard to the innate authority of such an agent, perhaps
enough has already been said.   It is indeed very extensive ; but, as
we have before intimated, it cannot extend to the creating of a lien
upon the entire property of the company.   The agent might almost
as well make a general assignment for the benefit of creditors, and
thus have it in his power to wind up the affairs of the company at
pleasure.   If the company had no other board of control but this
agent, then he would doubtless be expected to execute such con-
tracts, as the course of business might require in the term of time,
forming the ordinary interval between the stated meetings of the

stockholders. And as contracts of the kind here under consideration do not unfrequently become necessary to be executed, in order to carry forward the business of the company, such an agent, having the entire control of the business of the company, might be expected to execute them, without calling a special meeting of the company.

But in the present case this agent had no such universal control confided to him. The company had a board of directors, consisting of Warner, Henry Hodges and Silas H. Hodges; and this agent was performing the daily routine of the business of the company under their supervision and control. If any thing, out of the common course of this daily routine, occurred, the board of directors would be expected to be consulted. If they were not to be so consulted, it would be difficult to define their duty, or to graduate, with any degree of precision, the scale of authority between the board of directors and the general agent. We think, then, that this contract, to be binding upon the company in the first instance, and in consequence of its execution merely, should have received the approval of the board of directors in their ordinary mode of action.

2. As to any ratification of the contract by the company, or the directors, that is susceptible of being viewed in two aspects, First, it may be inquired, whether the company expressly ratified this contract of their agent. This, as a corporation, they could only do by an express vote, or by the action of some agent, appointed by vote. There is no pretence of any express vote to that effect. And although there is some testimony in the case, tending very fully to establish the point of the express consent of all the directors, still we think such was not the fact. We think the state of the correspondence, and the effort made by Cummings to keep what concerned this contract from the Hodges, and the reason which he assigned for it, namely, that he wanted their aid in other ways, and their conduct, when fully informed of this contract on the nineteenth of April, 1837, their evident surprise, must give a *counterpoise* to all the direct evidence upon this point.

There is, indeed, evidence to show, that the directors either did know that there was such a contract, or else, which is perhaps more probable, might have known it, if they had made thorough search into the manner, in which Cummings was conducting the business. But this they did not do. Evidently they had very great confidence

both in the skill and integrity of Cummings, and equal confidence in making most exorbitant profits from the manufacturing business. The plaintiffs, too, seem to have had much the same view upon all these points. This led them all into most extravagant, one might almost say absurd, confidence, both in regard to the manner of Cummings' management and the final solvency of the concern. There does not seem to us to be any just ground for charging either the plaintiffs or the defendants, for whose benefit the assignment was made, with any intentional dishonesty.

The history of the transaction is a melancholy one, well calculated to excite painful feelings in regard to the results of trade and speculation, both in a moral and economical point of view, and also as to the seductive influences of this mode of doing the most enormous amount of business,—upon mere credit, without one shadow of capital, or real pecuniary responsibility, in the corporation through whose agency the entire business was conducted. Most of the defendants, who took any active share in conducting the business of the corporation, have become beggarly poor and fled the country ; the responsible stockholders, in the most favorable view, have become embarrassed and greatly reduced in their circumstances ; while the plaintiffs, who seem to have been men of some substance in the outset, after being induced by the flattery, falsehood and fair promises of this agent (who knew all the airs of honest integrity so well, that he almost imposed upon his own credulity, by believing himself honest and well meaning, while he was in fact dragging both the plaintiffs and the stockholders into inevitable, irrevocable ruin) to make advances and incur liabilities to an enormous amount, were deprived of every cent of that security, upon which they had mainly relied, by one sweeping vote of the stockholders, by which every penny of the available property of the corporation was transferred, from what the plaintiffs esteemed their own prior claim, to the pockets of the very stockholders,—who made the assignment in payment of just debts, to be sure. And to make the picture more truly severe towards the plaintiffs, they are apprised of it as merely a necessary expedient, to prevent loss by attachments, and as intended to be only temporary ; and at the same time the strongest assurances are given of the entire solvency of the corporation,—which was, perhaps, believed by those who made it, at the time,—for men will be-

*lieve* almost any absurdity, under the intoxication of business specu-
lation. And this results in the bankruptcy of the plaintiffs on the
same day;—and, as the climax of these severe dealings towards the
plaintiffs, to characterize it by no harsher name, a draft for $1000,
accepted by them to put themselves in funds to meet their former
acceptances, with the most solemn assurances on the part of Cum-
mings, that every cent should be remitted to them, was, *after the
failure,* made use of *to swell the general assignment, for the benefit
of other creditors.* It is not wonderful, that even the elastic moral
sense of the agent was so shocked by this last act of baseness to-
wards the plaintiffs, as to compel him to cry out upon himself, and
to attempt to cast the fault upon others, who were to be benefited
by the treachery, and who might consent to the treason,—although
there certainly is no proof in the case, to show that they ever coun-
selled it.

All this certainly would not justify us in concluding, that there
was a preconceived purpose of defrauding the plaintiffs, by the stock-
holders. The failure of the corporation was no doubt wholly unex-
pected to them. It came upon them with a shock, amounting
almost to consternation. And drowning men must be expected to
cling to the most forlorn hopes, and to push the most desperate ex=
pedients; and that they seem, under such circumstances, a little
regardless of the rights of others ought not to strike us with surprise,
perhaps; the best of men, when pressed, will do things, and es-
pecially justify things, which, when less pushed by imminent peril of
their own lives and hopes, would have appeared shocking to them.

But we do think, that it ought not to surprise any one, that the
plaintiffs should feel, that they have been severely dealt with in this
affair, and that they ought to have some redress. And we think they
are entitled to some redress. It seems to us absurd to say, that, while
the entire business of this company was mainly carried along by means
of advances and acceptances of the plaintiffs, and much of the very
wool and cloth assigned had been purchased by funds primarily or
ultimately furnished by them, and when these acceptances were
given, or funds furnished, in faith of a contract made by the gener-
al agent of the company, that all wool so purchased, either with
funds or acceptances of the plaintiffs, should be theirs through all
the processes of its manufacture, it should, nevertheless, under all
57

these circumstances, be in the power of the company to adopt the act of the agent in borrowing the money, or procuring the acceptances, and in purchasing wool with funds so procured, but that they could reject the condition of this agency, by which the plaintiffs were secured, and which was the only ground, upon which the plaintiffs would have advanced the funds, or made the acceptances. To hold thus seems to us contrary to reason and to the settled doctrines of the law of agency.

It is no doubt true, as we have before shown, that the agent had no *innate* authority to give a general mortgage upon the personal property of the company, to secure money borrowed; and if that were done by the directors, it could not avail the plaintiffs, as against other creditors, until a delivery of the property to the plaintiffs, or their agents; and this possession, thus acquired by the delivery, must be kept up by the plaintiffs. Still, if the plaintiffs furnished funds to the agent upon certain conditions, and the company claim to retain the funds, they thereby ratify the act of the agent *in solido.* They cannot subdivide it. They must either adopt it, or reject it, *in toto.*.

It is not important in the present case to inquire, whether the act of the stockholders, in assigning property purchased by funds thus obtained by the agent, might not be considered a ratification of the contract made with the plaintiffs, to the full extent,—especially as this was done with a full knowledge of all the facts. This is not important, inasmuch as there was no change of possession made and kept up, which would enable the plaintiffs to maintain a lien upon property not purchased with their funds. But as to property which was purchased with their own funds, the title would never so vest in the company, as to defeat their lien for the price. *West v. Bolton,* 4 Vt. 558. *Paris* v. *Vail,* 18 Vt. 277.

We are, then, only to consider the plaintiffs' claim to a lien upon wool, yarn, or cloth, or other material, included in the assignment, which was purchased or paid for by funds or acceptances of the plaintiffs,— either in whole, or in part, to that extent. To this extent we think the plaintiffs are to be allowed to maintain their lien, upon two grounds;—First, that the company, by accepting of and appropriating the avails of the contract made by their agent with the plaintiffs, after they became aware of all the facts, have thereby

ratified the act of the agent in borrowing and using the money in their business;—Second, that if this were not to be considered a ratification of the act of the agent, then the application of the funds by the agent to the business of the company was an unauthorized act, and, as such, a misapplication of the plaintiffs' funds; and, under such circumstances, they may reclaim them, into whosesoever hands they have come.

1. The principle, that you cannot adopt the act of one professing to act as your agent, without taking it with all its conditions, *cum onere,* as the phrase is, is no new doctrine in the law of agency. It is as old as the common law,—not to go farther. It is found laid down in most of the elementary treatises upon the subject. It is the only rule upon the subject, which is consonant to reason. See Story on Agency, 245, § 250, citing Smith on Mercantile Law, 60 ; *Wilson* v. *Poulter,* 2 Str. 259; *Billon* v. *Hyde,* 2 Atk. 128; *Smith* v. *Hodson,* 4 T. R. 211; *Hovill* v. *Park,* 7 East 164; *Cornwall* v. *Wilson,* 1 Ves. 509; *Ferguson* v. *Carrington,* 9 B. & C. 59.

2. In regard to the other view of the case, which is substantially the ground upon which the argument is placed by the defendants, there is as little doubt, in my judgment. Suppose that Cummings did exceed his authority, in borrowing this money upon the security demanded, and that in that act he is to be treated as *the plaintiffs' agent.* He is still but a special agent, and can bind them only to the extent of his express authority. He is entrusted with their funds, by the plaintiffs, with express directions not to put them to the company's use, *unless they give the plaintiffs such security, as that specified in the contract.* But he nevertheless does do it, *contrary to his directions.* This is the common case of misapplication of funds by the agent. In all such cases, the principal may have redress, by pursuing the funds into whosesoever hands, or whatsoever shape, they may have come. Mr. Justice STORY, in his treatise on agency, page 225, says, "It will make no difference in law, as, indeed, it does not in reason, into whatever form, different from the original, the change may have been made,—whether it be into promissory notes, or other securities, or into merchandize, or into stock." In all these cases, and a great variety of others, the principal may reclaim the property.

Whitwell et al. *v.* Warner et al.

To apply this to the present case. Had the money been on hand, borrowed upon a contract like the one given to the plaintiffs, the company, by applying the money to the use of the corporation in any way, would confirm the contract of their agent and make the security good. If they elected to repudiate the contract, the money became the property of the plaintiffs, and they might pursue it, *in specie*,—and so, also, whatever was purchased with it. If the product of the money had become mixed with the other goods of the company, it might be more difficult to identify the plaintiffs' property,—but none the less their right to make the attempt to pursue it, so far as they can trace it;—"For," says Judge STORY, *ibidem*, "the product of the substitute for the original thing still follows the nature of the thing itself, as long as it can be ascertained to be *such; and the right only ceases, when the means of ascertainment fail." And the fallacy in the defendants' application of the rule of law, for which they contend, to the case, seems to lie in this,—that they will have it, that all the acts of their agent, which were beneficial to the company, are to be regarded as binding upon the plaintiffs, but that those, which exceeded the strict limits of his authority, although forming the *consideration* and *motive* for the other acts, may nevertheless be rejected. This is a sophism, which could hardly escape detection in any but interested minds.

But, in rejecting the contract *in solido*, we only leave the defendants where they would have been, if the plaintiffs had never made any advances to their agent. And as it is morally certain, that they never would have made them, except upon the expectation of the security specified in the agent's contract, and as that has been rejected by the company, few unsophistocated minds could fail to see and appreciate the justice of the conclusion, to which we come. It is certainly as favorable, as the defendants have any right to ask. The only doubt, which I have felt in regard to the subject, is, whether it is not more so. Had there been any valid change of possession, I should have felt, that the conduct of the company was fairly susceptible of such a construction, as to make it a confirmation of the act of the agent, to the full extent. But of that some doubt might exist. For the company *intended*, no doubt, to *repudiate* the act of the agent. It is, then, more consistent with the intention of the defendants, and, perhaps, with the absolute justice of the case, to per-

mit the plaintiffs, as far as practicable, to reclaim their own property.

The reason and justice as well as the law of the case, to that extent, must be apparent to all, one would suppose,—even to the defendants themselves. It is, too, in analogy to the rule, which prevailed in the civil law, as to all sales. It is also in analogy to that rule, which prevails in this state as to conditional sales. Indeed, it is, in substance, the very case of a conditional sale. For it cannot be denied, that the case of the plaintiffs is as favorable, as if they had, instead of furnishing funds to buy wool, furnished the wool itself, upon condition that it was to remain theirs, during all the processes of manufacture, until paid for. That would then be the very case of *Paris* v. *Vail*, 18 Vt. 277, and *Smith* v. *Atkins*, 18 Vt. 461, and many others, which have been decided by this court. It is clearly that case, or else the funds have been misapplied, and the plaintiffs may recapture them. And, in which ever point of light it is viewed, it seems to us too clear from doubt to require farther illustration.

Decree of the chancellor reversed, and the following mandate sent to the court of chancery.

It is ordered and adjudged, that the decree of the chancellor be affirmed as to Atherton and Fullerton, with additional costs in this court, and reversed as to all other defendants,—the case to be remanded to the chancellor, with instructions to make those defendants, who participated in making the assignment, or who were among the preferred creditors, or who were sureties for the payment of debts, which were among the preferred debts, or who were in any respect, directly, or indirectly, benefitted by the assignment, or who have in any way upheld the assignment, liable to an account, which shall be taken in proper form, of all wool, or cloth, or any of the product of wool in the process of manufacture, which wool, or cloth, or other product of wool, was included in said assignment, and which was purchased, or paid for, with funds furnished by the orators, either primarily, or ultimately, under the contract between Whitwell, Bond & Co. and the Green Mountain Woolen Manufacturing Company, on file in this case, whether in whole, or in part, to that extent, to be included in the account; and the orators to have a decree for all such sums, as may have been, or might, or

ought to have been, received by means of the disposition of such wool, or cloth, or the product of wool, so purchased or paid for by their funds, or for the restitution of the same, as to the chancellor shall seem just and equitable, against all the defendants retained, or such number of them as the chancellor may order and decree; and to make such decree in regard to costs, as he may deem just and equitable;—the object of the account being, to show, as far as practicable, the avails of the complainants' funds, which were on hand at the time of the assignment, and to give them restitution of the same, or the avails thereof, or compensation against such defendants, as, in conformity to the above rule, and the equity of the case, ought to be made liable,—having regard to the equities of the complainants against all the defendants jointly, or any number of them, and to the equities subsisting among the defendants themselves, so far as that can be regarded, without depriving the complainants of their just and reasonable security for any sum, which, under the foregoing order, they may ultimately recover.