# WHEELING.

## LAMB, TRUSTEE, *v.* LAUGHLIN.

Submited September 20, 1883.—Decided December 6, 1884.

Where the court has doubts of the right of the plaintiff to relief on the case stated in the bill, and a good cause for relief appears by the proofs, this Court will reverse the decree and give the plaintiff leave to amend his bill.

*Quære* 1. Are all the assets of an insolvent corporation a trust-fund for the payment of creditors of the corporation ?

*Quære* 2. If so, are the directors of the insolvent corporation trustees for the creditors?

*Quære* 3. Can a board of directors of an insolvent corporation prefer creditors and themselves among the number ?

*Quære* 4. Can a director of an insolvent banking corporation with full knowledge, that the corporation is insolvent and must close its doors, under these circumstances withdraw his deposits from the bank?

See opinion of Johnson, President, *infra.*

*W. P. Hubbard* for appellant

*Caldwell & Caldwell* for appellee.

JOHNSON, PRESIDENT :

On February 23, 1876, the plaintiff instituted this suit in the circuit court of Ohio county. The summons issued and was served on the defendant on said February 23, 1876. At March rules the bill was filed, which is substantially the same as that filed in *Lamb, trustee* v. *Cecil,supra.* The answer filed by Laughlin is substantially the same as that filed by Cecil in that cause, except that Laughlin did not claim in his answer, that any dividends had been paid to him by said trustee, and therefore did not raise the defence, raised in the two foregoing cases, on account of dividends having been paid by said trustee. The bill was demurred to as in the other two cases and was overruled; and the plaintiff tendered an amended bill of the same character, as was tendered in each of the foregoing cases, the filing of which was refused by the court. For reasons stated in the opinion in the two foregoing cases the court did not err in refusing to permit the said amended bill to be filed. The original bill charged, that the defendant Laughlin knowing the said institution to be insolvent availed himself of his superior knowledge as director and withdrew by the check of Laughlin Bros. & Co., of which firm he was a member, all of the deposits of said firm amounting to $3,783.66, when under the circumstances said fund constituted a trust-fund for the creditors of said institution and ought to have been permitted to remain in said bank for the creditors generally; and that said Laughlin being a director and a trustee for the creditors improperly withdrew said deposit and should be compelled to pay the same to the plaintiff, the trustee for said institution.

The cause was heard on the pleadings and proofs on May 31, 1883; and a decree was rendered against said Laughlin for the full amount of said deposits so withdrawn and interest less the amount, which he would be entitled to receive as dividends from said fund. The amount which the decree required him to pay to the said trustee was $5,692.86 with interest thereon from April 23, 1883.

From this decree Laughlin appealed.

This case greatly differs from the two former cases in this, that Laughlin received the amount of his check in currency and not in the discounted bills and notes, the property of the bank. But the peculiar circumstances, under which the check was cashed, are not fully stated in the bill. It is not there intimated, that the check was by an arrangement with the acting treasurer or cashier held up for a day to enable him to have it paid out of the funds of innocent depositors, who knew not the condition of the bank. Joseph Paull tells the whole story, although it implicates himself; and he evidently did not realize at the time that what he did was wrong. Mr. Paull says:

"Mr. Alexander Laughlin came into the bank a day before the money was drawn, and either presented me a check or a memorandum of the amount which he wished to draw, I don't remember which; and I told him I hadn't that amount of money in the bank; and he told me he wished I would get it for him if I could, and I told him I would. He asked me, if I wouldn't bring it down to the store and give it to Sam Laughlin in the morning. I got the money and went down to the store the next morning. Neither of them were in; it was early in the morning. I brought the money back to the bank again, and put it in a drawer in a desk, and about nine o'clock, I know it was just about the time the bank opened, to the best of my recollection Alex. Laughlin came in, and I handed him the money, although I am not positive whether it was Alex. or Samuel Laughlin. My recollection is it was Alex."

Question—"Was that all the conversation you had with him about the money or drawing it out of the institution the day before it was drawn?"

Answer—"Well, there was a conversation the day before

it was drawn that impressed itself upon my mind, but I prefer not to state it."

Question—"A sense of duty compels me to ask you to state that conversation fully?"

Answer—"Mr. Laughlin either asked me, or I told him, that none of the directors had drawn their money at that time; he either asked me whether any of them had, or I told him none of them had, I don't recollect which it was, and he remarked that he and Sam were poor boys, and that they could not afford to lose it, if the others could. That is about all of it, I believe."

The witness says he paid the money and it was drawn out on February 22, 1871. The witness further states, that the check so paid overdrew Laughlin Bros. & Co's. account on that day by $570.85. After the failure errors were discovered in balancing the books of $29.60, which would reduce the overdraft to $541.25.

Does the bill show the plaintiff is entitled to relief? What is the relation of a director of an insolvent banking corporation to the creditors? When directors are depositors and know the bank is hopelessly insolvent, may they make a rush for their deposits and delay the closing of the doors of the bank, until they have made themselves safe?

These are interesting and delicate questions. In answering them we must, if possible, not only do justice to the creditors of such institutions but at the same time avoid injuriously affecting the commercial interests of the country. And we must so lay down the law, if we can, that it can be understood, and its application not depend upon the arbitrary discretion of the judge, who is called upon to administer it. I propose to review a number of the most pertinent authorities cited by the learned counsel in their elaborate arguments filed.

The counsel for appellant relied upon the following among a large number of authorities cited by him: *Poole, Jackson & Whyte's Case*, 9 Ch. Dec. 322 (S. C. 26 Eng. R. 142); *Dana* v. *Bank of the United States*, 5 W. & S. 147; *Catlin* v. *Eagle Bank*, 6 Conn. 233; *Pondville Co.* v. *Clark*, 25 Conn. 97; *Smith* v. *Skeary*, 47 Conn. 47; *Whitwell* v. *Warner*, 20 Vt. 425; *Stratton* v. *Allen*, 1 C. E. Green 232; *Railroad Co.* v.

*Clanghorn*, 1 Speers 562; *Sargent* v. *Webster*, 13 Met. 497; *Buell* v. *Buckingham & Co.*, 16 Ia. 291; *Burr* v. *McDonald*, 3 Gratt. 216; *Merrick* v. *Coal Co.*, 61 Ill. 472; *Addison* v. *Lewis*, 75 Va. 720; *Planter's Bank* v. *Whittle*, 8 Va. L. J. 597, decided April, 1884.

In *Poole, Jackson & Whyte's Case*, it appears that three directors of a private manufacturing company, who had not paid or been called upon to pay anything on their shares, made themselves liable on their personal guarantee for money advanced to the company by a bank. The company being in difficulties, and the bank having recovered judgment against the guarantors, a resolution was passed by the board of directors, that in order to reduce the debt due to the bank the directors be recommended to pay in advance the amount of their shares. The three directors subsequently paid a sum equal to the amount of their shares, which was carried to the credit of the company at the bank. Two days afterwards a petition was presented, on which an order of winding up was made. It was held (reversing the decision of Bacon V. C.) that the three directors were guilty of no breach of trust or duty to the company in paying up their shares, in order to relieve themselves of their personal liability to the bank; that the payment was a valid payment on account of their shares, and that the shares must be treated as paid up shares.

Jessel, M. R. said: "The vice-chancellor decided the question on this ground, that the directors were trustees of all their powers. So no doubt they were. But it is further said that they exercised their powers in breach of trust and for their own benefit, and therefore that the act which they did was nugatory. But it appears to me that the question is: For whom were they trustees? It does not appear that the vice-chancellor considered this point; but it makes all the difference whether they were trustees for the persons who were injured by what had been done in the case, namely, the other creditors of the company. It has always been held that the directors are trustees for the shareholders, that is, for the company. They are the managing partners for the company, and if they abuse their powers, which they hold in trust for the company, to the damage of the company, for

their own benefit, they are liable to make good the breach of trust to their *cestuis que trust* like any other trustee. But directors are not trustees for the creditors of the company. The creditors have certain rights against a company and its members, but they have no greater rights against the directors than against any other members of the company."

In *Dana* v. *U. S. Bank*, it was held, that the bank had power to assign its property and effects in trust, to pay certain preferred creditors; that such power belongs to a corporation as to a natural person, unless it be restrained by its charter or other legal provisions; that the insolvency of the bank at the time of such assignment does not impair its power to assign for the benefit of preferred creditors.

In *Catlin* v. *Eagle Bank* it was held, that the mere insolvency of a bank incorporated with the usual powers of such an institution does not convert its effects into a trust-fund for its creditors; therefore when the Eagle Bank of New Haven became insolvent, and the directors afterwards mortgaged its real estate, assigned sundry promissory notes and paid a sum of money to the Savings Bank in security and payment of a debt due from the former to the latter institution for moneys deposited, it was held on a bill in chancery brought by another creditor of the Eagle Bank to have these conveyances set aside and all the funds of the bank distributed ratably among its creditors, that such bill could not be sustained.

Hosmer C. J. said: "Whether the directors of the corporation, after it has become actually insolvent, can make payment or give security to one of its creditors and leave another unpaid and without security, is the general question to be determined. It has been contended in behalf of the plaintiff with no inconsiderable ingenuity, that the legislature intended to render the corporation at all times a trustee for the creditors. This suggestion is too unfounded and too destitute of practical importance to be admitted or discussed. Such a principle during the solvency of the bank must be dormant and useless; and neither the charter nor the nature of the case furnishes any warrant for the supposition. If the corporation, so far as regards its right to manage and dispose

of its property, has power analogous with that which is vested in an individual, the plaintiff's bill is wholly destitute of merit. An individual debtor, who is actually insolvent, may prefer one creditor to another, unless in certain cases under the bankrupt laws; and to do this, as was said by Lord Kenyon, is neither illegal nor immoral. * * To discuss the reasons of the rule is unnecessary. It is sufficient to say to those, who are not disposed to unsettle foundations, that it is firmly and uniformly established both at law and in chancery." After citing a number of English and New York cases he further says in speaking of a corporation : "It is *an artificial person*, and this denomination is given to it by reason of its resemblance to a natural person in respect to its powers, rights and legal duties. It is difficult for me to conceive, when no restraint is interposed in a charter of incorporation, on what ground the general authority delegated is subjected to exception or fettered by restrictions, from which an individual and a mercantile company are free. And this difficulty is much increased, as no case intimating this diversity between corporations and individuals has been cited, nor can be found by my utmost researches. * * There exists no doubt that there have been many instances of actually insolvent corporations, where certain creditors have been preferred to others ; and the perfect silence until now on the subject of this fancied diversity is powerful to show what has been the universal opinion.

"It has however been insisted for the plaintiff, that on the actual insolvency of the bank the corporation was the *trustee* of the creditors; and if this be true the latter became the *cestuis que trust* of all the corporate estate. The consequence of this supposition would be that all persons coming into possession of the bank property with notice of the trust must be considered as trustees. (*Daniels* v. *Davidson*, 16 Ves. 249 ; *Moore* v. *Butter*, 1 Scho. & Lef. 262.) No express trust was created on the happenings of the bank's insolvency, but the charter on every fair principal of construction conferred on the corporation the entire control of its property as well after as before this event. · It however has been imagined, that the trust arose by operation of law. I enquire, of what law ? No principal or case or analogy has

been referred to, that supports the proposition; nor am I capable of conceiving any. The insolvent banking corporation is just as much a trustee of his creditors, and no more, as the insolvent individual is the trustee of his creditors. The relation of creditor and debtor exists in both cases; but from this relation no trust arises. Undoubtedly in all cases of actual insolvency the creditor would derive security from this doctrine; and often great losses might be prevented. But the interest of the insolvent person is not to be entirely disregarded. His creditor has voluntarily become such, with full knowledge that his security must very much depend on the integrity of his debtor. With open eyes he has given credit; and the public charter of the corporation has instructed him in all the powers and rights of the corporation. Now it would be a very harsh and inequitable doctrine, but on the plaintiff's claim it is inevitable, that the moment a banking institution is unable to pay all its debts, the directors of a bank may not issue a bank-bill, dispose of bank-property, make payment of a single debt or perform one bank operation. May not an individual or mercantile company under the same circumstances proceed in the usual train of business? This is not disputed. It is the law of chancery that they may prefer one creditor to another; and this on a principal of analogy refutes entirely the supposition of a trust in this case. * * That the directors of the Eagle bank are trustees, I admit; but they are the trustees of the stockholders. The stockholders are the *cestuis que trust*, and the charge of breach of trust must come from them."

This case in 6 Conn. from which I have quoted, was decided in 1826, more than half a century ago, and is the strongest case I have seen on that side of the question. The two other Connecticut cases cited are to the same effect.

In *Whitwell* v. *Warner*, 20 Vt. 425, it was held, that the stockholders of a corporation, who avail themselves of their superior advantages for the purpose of obtaining security from the property of the corporation for debts due to themselves, whether it be done by attachment or by assigning the property to a trustee by vote, are not thereby guilty of a fraud in contemplation of law, so as to render themselves liable personally for the debts of the corporation.

In *Stratton* v. *Allen*, 1 C. E. Green 232, it was said by the chancellor: " The alleged ground of fraud is that the company being insolvent, the judgments were confessed to a director for the purpose of giving him a preference over other creditors having equally meritorious claims. In considering this question it will be assumed that the entire sum, for which the judgments were confessed, was due from the corporation, and that there was no actual fraud in the transaction. The mere fact that the creditor was a director of the company does not render the transaction fraudulent. There is nothing which forbids either the members or directors of a corporation to make contracts with it, like any other individual; and when the contract is made the director stands as to the contract in the relation of a stranger to the corporation."

In *Railroad* v. *Clanghorn*, 1 Speers, 562, Johnson, chancellor, said: " The directors of a corporation ought to be, and generally are, better informed as to its liabilities and resources than any one else, and if they having the means refuse to aid it in its operations by the loan of money or credit, no one else will be found to do it; and I need not add what is known to all having any experience, that an overweening confidence in their capacity to manage the affairs of a corporation, and a mistaken view of the state of its finances, has often involved the stockholders, and especially the directors in distress and ruin. * * There is nothing either in law or equity, which forbids a member or even a director of a corporation from contracting with it, and like any other individual he has a right to prescribe his own terms, which the corporation is at liberty to accept or reject, and when the contract is concluded he stands in the same relation to the other creditors of the corporation, as any other individual would under the same circumstances. When the question of priority arises, it must depend upon the *bona fides* of the transaction, fraud or no fraud. If by greater diligence and without fraud he has fairly gained an advantage over the other creditors, he is entitled to retain it."

In *Buell* v. *Buckingham & Co.*, Dillon judge, said: " Being an officer in the corporation did not deprive Buell of the right to enter into competition with other creditors and run a race of vigilance with them, availing himself in the contest of his

superior knowledge and of the advantages of his position, to obtain security for, or payment of his debt. He has an advantage, it is true, but it is one which results from his position and which is known to every person who deals with and extends credit to, a corporation. This is one of the causes which has operated to bring corporate companies into discredit, and may constitute a good legislative reason for giving priority to outside creditors. But the legislature must furnish the remedy. * * In addition to being a creditor, Buell sustained to the corporation the relation of a stockholder and director. Such companies are essentially partnerships, except in form. The directors are the trustees or managing partners, and the stockholders are the *cestuis que trust*, and have a joint interest in all of the property and effects of the corporation."

In *Merrick* v. *Peru Coal Company* it was held, that a shareholder or officer of a private corporation has a right to deal with the company in the same manner as strangers, and when he does so, such party acquires the same rights and incurs the same liability as in the case of a contract with a stranger.

In *Burr* v. *McDonald*, a manufacturing company preferred certain of the corporators, and the court by Allen judge, said: " The facts and circumstances attending the execution of the deed in question repel the slightest imputation of fraud. So far as any preference was given to the individual corporators, it was to refund to them advances made and liabilities incurred for the payment of loans contracted to enable the company to commence its operations. The proceeds of said loans have gone to the increase of the means of the company to meet its general liabilities, and as by the embarrassments of the company the stockholders may properly be subjected to the loss of their capital stock, there is nothing unjust or inequitable in securing such of them as had become liable for such loans, or who had made advances to discharge the same, leaving the residue of the estate of the company increased as it may have been by such loans to be distributed *pro rata* among the general creditors after discharging the prior incumbrances and the loans and advances on account thereof."

In *Addison* v. *Lewis* it was held, that the directors of a

corporation are its officers or agents and represent the interests of that abstract legal entity and of those who own the shares of its stock.   One of the objects of creating a corporation by law is to enable it to make contracts, and those contracts may be made with the stockholders as well as with others.

In *Planters' Bank* v. *Whittle* by order of the board of directors certain bonds, the property of the bank, were assigned to pay a certain indebtedness of the bank; and this assignment had been made, after suits had been brought by creditors, and a notice had been given, that the court would be asked to appoint a receiver for the bank.   The assignment was made on March 1, 1879, and a receiver appointed on the 13th of that month.   The court after citing several of the authorities above quoted from held, that directors are bound to discharge their duties prudently, diligently and faithfully, and to apply the assets in case of insolvency for the benefit of the creditors in preference to the stockholders and other persons. But they are not technically trustees nor bound to apply the assets ratably among the general creditors.   They may not only make preferences between creditors, but such preference may be made in their own favor if they be creditors.   But in such case they must act in the utmost good faith."

The counsel for appellee relied upon the following among many other authorities cited by them : *Wood* v. *Dummer*, 3 Mason C. C. 308; *Bradley* v. *Farwell*, 1 Holmes, C. C. 433; *Richards* v. *Insurance Company*, 43 N. H. 263; *Godin* v. *Canal Company*, 18 Ohio St. 169; *Bartlett* v. *Drew*, 57 N. Y. 587; *Hastings* v. *Drew*, 76 N. Y. 9; *Shea* v. *Mabry*, 1 Lea. 319; *Jones, McDowell & Co.*, v. *Arkansas Mechanical & Agricultural Association*, 38 Ark. 17; *Koehler* v. *Black River Company*, 2 Black 720; *Curran* v. *Arkansas*, 15 How. 308; *Drury* v. *Cross*, 7 Wall. 302; *Sanger* v. *Hoag*, 17 Wall. 610; *Upton* v. *Tribilcock*, 91 U. S. 47; *Sanger* v. *Upton*, 91 U. S. 56; *Hatch* v. *Dana*, 101 U. S. 210; *County of Morgan* v. *Allen*, 103 U. S. 498; *Coons & Braine* v. *Torne*, 9 Fed. R. 532.

In *Wood* v. *Dummer* it appears, that an incorporated bank divided *three fourths* of its capital stock before the expiration of its charter among the stockholders without providing funds, which ultimately were sufficient to pay its outstanding

bank-notes; and it was held, that the capital stock was a *trust-fund* for the payment of the bank-notes, and might be followed into the hands of the stockholders. Story, judge, said : " It appears to me clear upon general principles as well as the legislative intention, that the capital stock of banks is to be deemed a pledge or trust-fund for the payment of debts contracted by the bank. The public as well as the legislature have always supposed this to be a fund appropriated for such purpose. The individual stockholders are not liable for the debts of the bank in their private capacities. The charter relieves them from personal responsibility, and substitutes the capital stock in its stead. Credit is universally given to this fund by the public as the only means of repayment. During the existence of the corporation it is the sole property of the corporation, and can be applied only according to its charter, that is as a fund for the payment of its debts, upon the security of which it may discount and circulate notes. Why otherwise is any capital stock required by our charters ? If the stock may the next day after it is paid in be withdrawn by the stockholders without payment of the debts of the corporation, why is its amount so studiously provided for, and its payment by the stockholders so diligently provided for? To me this point appears so plain upon principles of law as well as common sense, that I cannot be brought into any doubt that the charters of our banks make the capital stock a trust-fund for the payment of all the debts of the corporation. The bill-holders and other creditors have the first claims upon it; and the stockholders have no rights until all the other creditors are satisfied. They have the full benefit of all the profits made by the establishment, and cannot take any portion of the fund until all the other claims on it are extinguished."

In *Curran* v. *Arkansas* 15 How. the bill showed, that the capital stock of the bank consisted of $1,146,000.00 raised by the sale of bonds of the State, together with certain other sums paid in by the State as part of the capital stock, amounting in the aggregate to the sum of $350,753.00 being in the whole $1,496,753.00 all of which was in specie or specie funds; that the bank was required by its charter to have on hand at all times sufficient specie to pay its bills on demand; that the plaintiff being the owner and bearer of bills of this

bank amounting to upwards of $9,000.00, which the bank has refused to pay, instituted suits and recovered judgments thereon at law, &c.; that the bank having gone into operation issued bills to a large amount and after a time in November, 1839, refused to pay the same; that in 1843, the bank still continuing insolvent, the Legislature passed an act to liquidate and settle its affairs; that by said act bonds of the State amounting to at least $200,000.00 were required to be given up and cancelled and their amount to be credited to the bank against a part of the capital-stock put in by the State. The bill prayed for satisfaction out of the assets of the bank thus shown to have come into the custody or to stand in the name or to have gone to the use of the State by force of the acts of the legislature. A demurrer to the bill was sustained; and the bill dismissed by order of the supreme court of Arkansas. Mr. Justice Curtis in delivering the opinion of a majority of the court said :

"The plaintiff is a creditor of an insolvent banking corporation. The assets of such corporation are a fund for the payment of its debts. If they are held by the corporation itself, and so invested as to be subject to legal process, they may be levied on by such process. If they have been distributed among stockholders or gone into the hands of other than *bona fide* creditors or purchasers, leaving debts of the corporation unpaid, such holders take the property charged with the trust in favor of creditors, which a court of equity will enforce and compel the application of the property to the satisfaction of their debts. This has been often decided and rests upon plain principles." He cites with approbation section 1,252, Story Eq. Jour. which contains the same principles. He further said : "So far therefore as the property of this bank has vested in the State or gone to its use, it is so vested and used charged with a trust in favor of this complainant as an unpaid creditor, unless there is something in the character of the parties or the consideration, upon which, or the operation of the laws, by force of which it has been transferred, taking the case out of the principles above laid down."

In *Drury* v. *Cross*, 7 Wall. a sale far below the value of a railroad with its franchises, rolling stock, &c., under a decree

of foreclosure was set aside as fraudulent against creditors, the sale having been made under a scheme between the directors of the road and the purchaser, by which the directors escaped the liability on endorsements, which they had made for the railroad company; and the purchasers were held to be trustees to the creditors for the full value of the property purchased, less a sum, which the purchasers had actually paid for a large lien-claim.  Mr. Justice Davis speaking for the whole court, p. 302 said:

"The conduct of the directors of this railroad corporation was very discreditable and without authority of law.  It was their duty to administer the important matters committed to their charge for the mutual benefit of all parties interested, and in securing an advantage to themselves not common to the other creditors they were guilty of a plain breach of trust. To be relieved from their endorsement they were willing to sacrifice the whole property of the road.  Bound to execute the responsible duties intrusted to their management with absolute fidelity to both creditors and stockholders, they nevertheless acted with reckless disregard of the rights of creditors as meritorious as those whose paper they endorsed.  If Bailey & Co. had sold iron to build the road, so had the Boston Association sold locomotives to run it.  It is not easy to see why the corporation should exhaust its efforts to pay one, and leave the other unpaid.  But it is said, the directors being unable to pay both, had the right to choose between them.  We do not deny that a debtor has the right to prefer one creditor over another, when the transaction is *bona fide*.  But this is in no just sense a case of preference between creditors.  If the law permits the debtor in failing circumstances to make choice of the persons he will pay, it denies him the right in doing it to contrive that the unpreferred creditor shall never be paid. In other words the law condemns any plan in the disposition of property which necessarily accomplishes a fraudulent result."

In *Koehler* v. *Black Run Falls Iron Co.*, 2 Black, Mr. Justice Davis said for the whole court:  "Instead of honestly endeavoring to effect a loan of money advantageously for the benefit of the corporation, these directors in violation of their duty, and in betrayal of their trust, secured their own debts to the injury of the stockholders and creditors.  Di-

rectors cannot thus deal with the important interests entrust-
ed to their management. They hold a place of trust, and by
accepting the trust are obliged to execute it with fidelity, not
for their own benefit, but for the common benefit of the
stockholders of the corporation."

In *Sawyer* v. *Hoag*, 17 Wall, the court by Mr. Justice Mil-
ler said: "Though it be a doctrine of modern date we think
it now well established that the capital stock of a corpora-
tion, especially its unpaid subscription, is a trust-fund for
the benefit of the general creditors of the corporation. And
when we consider the rapid development of corporations as
instrumentalities of the commercial and business world in the
last few years, with the corresponding necessity of adapting
legal principles to the new and varying exigencies of this
business, it is no solid objection to such a principle that it is
modern, for the occasion for it could not sooner have arisen.
* * * The debt which the appellant owed for his stock
was a trust-fund devoted to the payment of all the creditors
of the company. As soon as the company became insolvent,
and this fact became known to the appellant, the right of
set-off for an ordinary debt to its full amount ceased. It be-
came a fund belonging equally in equity to all the creditors,
and could not be appropriated by the debtor to the exclusive
payment of his own claim."

In *Upton* v. *Tribilcock*, 91 U. S., Mr. Justice Hunt for the
whole court said: " The capital stock of a moneyed corpora-
tion is a fund for the payment of its debts. It is a trust-fund
of which the directors are the trustees. It is a trust to be
managed for the benefit of its shareholders during its life,
and for the benefit of its creditors in the event of its dissolu-
tion. The duty is a sacred one and cannot be disregarded.
Its violation will not be undertaken by any just minded man,
and will not be permitted by the courts. The idea that the
capital of a corporation is a foot-ball to be thrown into the
market for the purpose of speculation, that its value may be
elevated or depressed, to advance the interests of its managers,
is a modern and wicked invention. Equally unsound is the
opinion that the obligation of a subscriber to pay his sub-
scription may be released or surrendered to him by the
trustees of the company. This has been often attempted, but

never successfully. The capital paid in, and promised to be paid in, is a fund which the trustees cannot squander or give away. They are bound to call in what is unpaid, and carefully to husband it when received."

In *Jackson* v. *Ludeling*, 21 Wall. 616, it was held, that the managers and officers of a company, whose capital is contributed in shares, are in a very legitimate sense trustees alike for its stockholders and its creditors, though they may not be trustees technically and in form. They accordingly have no right to enter into or participate in any combination, the object of which is to divest the company of its property and obtain it for themselves at a sacrifice. They have no right to seek their own profit at the expense of the company, its stockholders, or even its bondholders.

In *County of Morgan* v. *Allen*, 103 U. S. 498, it was held, that where a county subscribed to the capital stock of a railway company and issued its bonds therefor, the creditors of the company on its becoming insolvent are entitled to enforce the liability of the county on the bonds, which are due and unpaid. Mr. Justice Harlan for a majority of the court said, page 509 : " The county recognized the dangers which beset the original enterprise in furtherance of which its people had voted a subscription of stock payable in bonds. Its officers believed it would inevitably fail, and that the ends expected to be accomplished by the aid voted would not be attained. It was for these reasons therefore, that they sought, or acceded to an arrangement looking to the protection of the county against liability. But it is clear that other creditors besides those with which it combined, had an interest in the disposition of the assets of the company, and that the plan as conceived and consummated was wholly inconsistent with the established doctrines of equity. Upon recognized principles of public policy and good faith, the debt which the county owed, by reason of its subscriptions and the bonds given therefor, constituted with other property of the company, a trust-fund to which all its creditors could rightfully look for satisfaction of their claims. * * The company had become, and all its creditors knew, wholly unable to meet its engagements, and had practically ceased to exist. The bonds in question were part of its assets in which all its cred-

itors had an interest. The county by an arrangement with some of those creditors attempted to lessen its obligation to pay what it had stipulated to pay, and thereby defeat the rights of other creditors who had as much claim upon the assets of the company as those with whom the county contracted. What it did is utterly indefensible under any known rules of equity."

In *Shea* v. *Mabry*, 1 Lea. a bill was filed by a judgment creditor of a railroad corporation alleging, that the defendants were the board of directors of the company; that Mabry was president; that as such directors they were trustees of the funds loaned and paid to said road for the purposes of its construction and equipment, of which there were more than two and a quarter million dollars of State bonds and nearly four hundred thousand dollars from other sources; that this was enough to construct and equip said road and leave a large surplus; that nearly all these funds had come into the hands of the defendants, who had squandered them, &c.; that these funds should have been used to pay the debts of the corporation; and for these breaches of trust the bill sought to hold the defendants personally liable. The court dismissed the bill on the hearing; and the plaintiff appealed. The supreme court reversed the decree, and granted the relief prayed. In delivering the opinion the court said:

"Whether these trustees acted in good faith or not, whether by negligence or fraud they sanctioned this application of trust-funds, they must, as they resolved they would do, bear the responsibility. What that is the law has made clear. Directors are not mere figure-heads of a corporation. They are trustees for the company, for the stockholders, for the creditors and for the State. They must not only use good faith, but also care, attention and circumspection in the affairs of the corporation, and particularly in the safe-keeping and disbursment of funds committed to their custody and control. They must see that these funds are appropriated as intended to the purposes of the trust, and if they misappropriate them or allow others to divert them from these purposes they must answer for it to their *cestuis que trust*."

In *Hasting* v. *Drew*, 76 N. Y. it was held, that the property

of every corporation is to be regarded as a trust-fund for the payment of its debts.

The same principle is distinctly held in *Godin* v. *Canal Co.*, 18 Ohio St. 182.

In *Richards* v. *Insurance Co.*, 43 N. H. it appears that a loss had occurred, and by vote of the directors $1,500.00 was voted to pay it; there being no money, an assessment of fifteen per cent. on all unexpired premium notes was ordered for the purpose of raising money to pay debts. The money which the directors received, they did not use for the purpose of paying the loss but applied it to the payment of debts, for which they were personally liable. Bell, C. J. in delivering the opinion of the court said: "It is claimed that the plaintiff's are entitled to a *pro rata* share of the money raised by the assessment which was applied to the payment of other debts exclusively, on the ground that the directors were trustees as well of the individual members having claims against the company itself. * * We find the rule recognized in this State on this subject in the case of *Colby* v. *Copp*, 35 N. H. 434. The general rule clearly should be, that when an agent or trustee receives money generally and he holds claims of different persons, to each of whom he is under the same obligation, he should apply the money ratably to the discharge of all the claims; and this obligation would be in no way affected by the circumstance that if the debts were all his own he would have the undoubted right to apply the money to either of them at his election. Every agent and trustee who has claims of his own must be regarded as agent for himself and others, and bound to give his diligence and care equally to all the claims in his hands, and consequently to apply all moneys paid to him, without an appropriation by the debtor to the payment of all the claims in his care whether of his own or others, in just proportion to their amounts. This principle seems to us justly applicable to this case. The defendants were such agents and trustees, bound to apply the funds raised by the assessment for the general purpose of discharging the debts and liabilities of the insurance company to the payment of all such debts ratably, and in just proportion to the amount of their claims. * * Neither does it seem to us that the fact that the directors had become

personally responsible for the debts which have been paid, furnishes any ground for preferring these debts. The rule is a just one that an agent is bound to apply the same diligence to obtain payment of debts in his care that he does to recover his own; and sound policy seems to require that the managers of corporations should be held strictly to this rule, that when the corporation becomes embarrassed or insolvent the directors may not apply the assets to exonerate themselves, and leave the other creditors without remedy."

In *Jones, McDonald & Co.* v. *Arkansas Machine and Agricultural Co.*, 38 Ark. it was distinctly held, that the assets of an incorporated company are a trust-fund for the payment of its debts and may be followed into the hands of any person having notice of the trust. The court said: "Now it is quite plain that Weeks was not a *bona fide* purchaser without notice of the trust. As a director he is conclusively presumed to know the pecuniary condition of his company. Moreover his deposition shows that he had actual knowledge that it was on the verge of insolvency."

In *Bradley* v. *Farwell*, 1 Holmes C. C. R., it was held, that the directors of an insolvent corporation, while it is under their management, hold the position of trustees of its assets for the benefit of its creditors, and, if themselves creditors, they cannot secure to themselves any preference or advantage over other creditors. Shipley J. said: "The real issue presented for the consideration of a court of equity in this case is, whether the managing officers and directors of this insolvent corporation held such a relation of trust to the funds of the insolvent corporation for the benefit of the creditors and all persons and parties interested, that according to the principles applied by courts of equity to cases of like trusts they are to be held guilty of a breach of trust by securing an advantage to themselves not common to the other creditors, and by providing for the payment of a debt or a large part of the debt, due to a director of the assets of the corporation to the entire exclusion of the payment of any and all other debts due from the corporation." "Courts" of equity "will not permit trustees in the exercise of the powers of their trust, or in dealing with the trust estate to obtain any benefit or advantage for themselves to

the injury or prejudice of those for whom they are acting in the fiduciary relation, or to protect, indemnify or pay themselves at the expense of those who are similarly situated in relation to the fund. * * The relation between the directors of a corporation and its stockholders is that of trustees and *cestuis que trust.* * * As directors are intrusted with the general management and control of the affairs and property of the corporation, this management and control must be exercised by them in the character of trustees, and subject to responsibilities under the law of trusts imposed upon those who have assumed, and are consequently under obligation faithfully to execute a trust. They are not merely trustees for the stockholders ; without considering their duties and obligations in other respects to the state, the community and other parties who may resort to courts of law or equity to compel a faithful performance of this trust; we need now only consider, in the case of an insolvent corporation, what their relation is to the creditors of the corporation, and to funds available for the payment *pro tanto* of corporate debts. * * What is of comparatively modern date is the application of old and well settled doctrines of equity applicable to the exercise of trust-powers and duties to the new state of facts growing out of the rapid development of corporations. As new trusts are created courts of equity apply to the modern trust the ancient principles applicable to all trusts in the same manner as, when railways and telegraphs were first constructed, courts both of law and equity applied to railway and telegraph companies the same principles they had previously applied to like corporate bodies. The vast increase of corporate property and the immense accumulation of corporate liabilities at the present time, and the consequent dependence of both stockholders and creditors upon the fidelity with which the managers of these corporations exercise the powers of their trust, would seem imperatively to require, that the salutary rules so rigidly enforced by courts of equity in other cases of fiduciary relation should not be relaxed in this class of cases where the trust-powers are of such magnitude and the consequences of a breach of trust so disastrous. Especially in the case of insolvent corporations are the acts of the managing officers to be free from

the imputation of having been influenced by the consideration of any interests adverse to those they are bound only to regard. Standing in a fiduciary relation, as it were at the bedside of a dying patient, if they are subsequently found in possession of a portion of his effects, they must show title by a conveyance untainted by the exercise of that power which the trust-relation gave them to influence the disposition made by the decedent of his property in their favor and to the prejudice of others having equal claims to the inheritance." The deed giving the preference to the director was set aside.

In *Coons & Braine* v. *Torne*, 9 Fed. R. the board of directors of an insolvent corporation confessed a judgment to the president of the corporation, to give him preference over another creditor, who was about to obtain a judgment for his claims. The case was decided by Judge Acheson in the western district of Pennsylvania in 1881. The judge said: "But could the board of directors under the circumstances give such preference to Jacob Torne, who was both a director of the corporation, and the president, and also the principal stockholder, owning indeed at least eight-tenths of the entire capital stock? I am of opinion that they could not. The mortgaged premises, it is shown, are wholly insufficient to pay the principal of the mortgage-debt; and if the lien of Torne's confessed judgment be preferred to that of Coons & Braine, the latter will receive nothing out of the assets of this insolvent corporation. Such a result thus brought about would be so inequitable that it cannot receive judicial sanction. True a failing debtor ordinarily may prefer one creditor over another. But the circumstances here were such as to take the case out of the general rules. The directors of a corporation stand in confidential relations to its creditors, toward whom they are bound to act with perfect fairness. They are at least *quasi* trustees for the creditors; and where the corporation is insolvent, good faith forbids that the directors should use their position to save themselves or one of their number at the expense of others."

It seems to me, that the doctrine, that the directors of a corporation do not sustain a fiduciary relation to the creditors, is based on no better reason, than that a natural person or

the members of a partnership do not sustain a confidential relation to their creditors. Is this reason a sound one? Is there no difference between the natural person and the *artificial person* called a corporation? A person goes into mercantile business. He is worth it may be $100,000.00. His creditors trust him more on the faith of his property than his business management. They know that his liability is unlimited; that all he has is held for his debts. Not so with a corporation. In this State as well as others no stockholder, after he has paid his stock-subscription, is liable personally for any part of the debts of the corporation. The Wheeling Savings Institution according to the evidence in 1870 had a capital of $50,000.00, yet the depositors lost about $300,000.00, six times as much as the whole capital-stock. This corporation by its directors was by law permitted to carry on business, receive deposits, &c., and its stockholders would have reaped all the profits after the debts were paid, and yet are not personally liable for the debts of the corporation. The corporation has conferred upon it a privilege, which the natural person does not possess; and the modern authorities recognizing this distinction and the great necessity for strict management of its affairs have declared, that its assets are a trust-fund for the payment of creditors. Some of the authorities declare that the capital-stock is a trust-fund for the payment of the debts of the corporation. If the capital stock is, then why not that which represents the capital stock? $50,000.00, say, is paid in as the stock-subscription. This money is loaned and bills and notes taken therefor. The $50,000.00 in cash is gone, but there is its equivalent with its accumulated earnings. If the capital-stock is a trust-fund for the payment of the debts of the corporation, then, I think, all the assets of the corporation are a trust fund for the same purpose. Why should this not be true? It is a very old doctrine, as old as corporations themselves, that the stockholders are not entitled to receive anything from the corporation until its debts are paid. If that is so, it seems to me it follows, that the creditors are entitled to all the assets of the corporation if necessary for the payment of their debts.

But if the assets of a corporation are a trust-fund for the

payment of the debts, who holds this property in trust? The directors are the managers of the corporation, and it has long been held, that they are trustees for the corporation and its stockholders. How are they to act towards the stockholders? They are to prudently and faithfully manage the affairs of the corporation, pay its debts and divide the residue among the stockholders. They must necessarily look after the debts, before they can discharge their trusts to the stockholders. If the assets are a trust-fund for the payment of the debts of the corporation, it necessarily follows, that the directors, in whose hands are those funds, are the trustees for the creditors of the corporation.

When the directors of a banking corporation ascertain that it is hopelessly insolvent, so that individually they are unwilling longer to aid it, their manifest duty is to close its doors at once; for continuing to do business then (as receiving deposits) is a fraud upon the public, and they should not receive any more deposits nor pay any more checks, but should proceed to execute their trust, either by making a general assignment for the benefit of the creditors, or by paying *pro rata* the debts of the corporation. Whether the board of directors could then under peculiar circumstances make preference of creditors, as was done in *Burr* v. *McDonald*, 3 Grat., it is unnecessary to decide in this case. But the directors had no right occupying the fiduciary relation to the creditors generally, which they did, to keep the doors of the Wheeling Savings Institution open, until they could get out their deposits, and all the time from the 21st of February, 1871, until the 25th of the said month, luring depositors to give credit to the insolvent concern, while some of them at least, including the defendant in this cause, were receiving their money from deposits thus improperly received. Before Laughlin received his money, the directors under the evidence in this cause should have closed the doors of the institution. Under these circumstances he had no right to draw his money and thus prefer himself to the other creditors, for whom he was acting as trustee. To do so was a gross breach of trust and was also fraud ; and in my opinion the decree of the circuit court ought to be affirmed.

For the reasons stated in *Lamb* v. *Cecil*, the statute of limi-

tations will not apply in this case, nor the doctrine of *laches*. The other objections to relief in this cause are answered in *Lamb* v. *Cecil*, *supra*, except the objection, that the other members of the firm of Laughlin Bros. & Co. were not made defendants. There is nothing in this objection. Laughlin is proceeded against, because as a director he did the act complained of. He was guilty of the breach of trust, and not his partners; and for it he must answer. If they were preferred, they were not necessarily parties. No relief is sought against them. Laughlin drew and presented the check and received the money.

I have investigated this subject, because it was necessary to ascertain whether the relief granted was proper under the bill. And I have reached the conclusion, that the plaintiff is entitled to recover on the case stated in his bill upon the proof taken in the cause. My associates however are not prepared to concur with me in much of the reasoning nor in the conclusion reached, to affirm the decree. They think, the case proved is essentially different from the case stated in the bill, and while they doubt the right to relief on the case stated in the bill, we all agree, that if a creditor with knowledge of the insolvency of an institution made an arrangement with the acting cashier, by which a check was to be paid not in the ordinary course of business but was to be held by him until sufficient money was deposited in bank to pay it, which arrangement was carried out, and the money laid aside for him under such arrangement, such agreement was fraudulent, and the money thus drawn out by a depositor a court of equity would compel to be returned. Such conduct on the part of a depositor under such circumstances, whether he was a director or not, could not be tolerated. The evidence tends strongly to show this state of facts; and my associates think that, as the real case is not stated in the bill, the court ought not to decide the cause until it is so stated.

The decree of the circuit court of Ohio county is therefore reversed with costs to appellant to be paid out of the assets of the Wheeling Savings Institution by the appellee, Daniel Lamb, trustee; and this cause is remanded to the circuit court of Ohio county with leave to the plaintiff to amend his bill,

as above indicated; and to such amended bill Joseph Paull must be made a defendant; and for further proceedings to be had.

REVERSED.    REMANDED.